FILED
JUL 8 2002
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

ENTERED
JUL 8 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| ELTON LARRY SMITH, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: CV-01-PT-1896-E |
| HONEYWELL, INC., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This cause comes to be heard on defendant Honeywell, Inc.'s ("Honeywell") Motion for Summary Judgment filed on May 14, 2002.

### FACTS

Plaintiff Elton Larry Smith ("Smith"), a white male, was hired by Garrett Airlines as a Mechanic in 1988.[1] Garrett Airlines later became Allied Signal, and Allied Signal was purchased by defendant Honeywell in 2000.

As an employee of Allied Signal, Smith was aware of the company's policy against race, sex and age harassment. He received training and the booklet explaining the Allied Signal Code of Conduct. When Honeywell purchased Allied Signal in 2000, Smith was aware that Honeywell prohibited all forms of harassment.[2] Smith was also aware that any violation of the Workplace Harassment Policy could be reported to Honeywell's Human Resources department, and an employee could be disciplined in any form, including termination.

---

[1] Smith's date of birth is April 21, 1951.

[2] During discovery, Smith produced a copy of Honeywell's "Workplace Harassment Policy" statement which prohibits all forms of harassment. Smith testified that he understood this policy to be in place at the time of his termination. (Smith Depo. at 173).

In February 2001, Smith worked in the Valves Department as a Mechanic Analyst. Smith would occasionally announce to his co-workers a particular name he desired to be called on that day.[3] On February 16, 2001, Smith stated that his name for the day was "Wachinka Totonka", an Indian name meaning "white man buffalo."[4] Smith informed Joe Berry ("Berry"), a black, male co-worker, that his name for the day was "Wachinka Totonka." Berry asked Eugene Encinias ("Encinias"), Smith's Line Leader, the Spanish words for "black foot" ("pie negro"). Berry did not ask to be called these words.

Encinias, a Hispanic male, had taught Smith Spanish words and terms. Smith learned the term "miate" from Encinias and knew that the term meant "nigger." Smith was also aware that the Spanish word "puto" meant "whore."

During the work day on February 16, 2001, Smith approached Berry and leaned against him. According to Smith, Berry turned to him and said, "Old man, you had better get your scummy self over yonder and sit down." (Smith Depo. at 196-97). Smith responded by saying "Oh shut up, Miati *Puto*" or "Oh shut up, Miati *Foto*."[5] Berry was unaware that these words translated to English meant "nigger whore." After co-workers informed Berry of the translation, Berry approached Encinias and asked him to not teach Smith anymore Spanish words because he could not use them in an appropriate manner. Smith, hearing Berry's request, became upset and

---

[3] Two names that Smith had asked his co-workers to call him on particular days were "Snuffy Smith" and "old man."

[4] Smith had recently learned that one of his grandmothers was "nearly full-blooded Indian." He did not feel insulted or offended by the term "Wachinka Totonka." Apparently, Smith learned the meaning of the Indian name from the movie *Dances with Wolves*.

[5] Smith stated in his deposition that he knew the word "Miati" meant "nigger" in Spanish. (Smith Depo. at 204). He also testified that he was aware the word "*Puto*" meant "whore" in Spanish. *Id.* According to Smith, he called Berry "Miati *Foto*." *Id.* Smith had never heard the Spanish word "Foto" before. *Id.* It was his belief that the word "Foto" meant "foot." *Id.* at 205.

2

pointed his finger in Berry's face. Berry told Smith to sit "his damn ass back down." Encinias told both employees to get back to work. Smith never apologized to Berry for the comment.

Berry reported the comment the next day to Anne Jonakin, a Human Resource Coordinator. On Tuesday, February 19, 2001, Andy Trosper ("Trosper"), a white male and Valve Product Line Director, brought Smith to the Human Resources department. Trosper and Wendy Graham ("Graham"), a white female, HR Manager, interviewed Smith regarding the occurrence. Smith admitted that he had asked co-workers to call him "white man buffalo." He also indicated that Encinias had informed him that "miate puto" meant nigger whore in Spanish. Trosper and Graham suspended Smith, with pay, pending an investigation into the matter.

During the investigation, Trosper and Graham interviewed seven employees, including Smith. Grover Heath ("Heath"), a white male, stated that he heard Smith call Berry a "miate puto." Heath later asked Berry if he knew what this term meant. Toby Bray ("Bray"), a white male, stated that he witnessed Smith call Berry a "puto miate." Bray witnessed Heath ask Berry if he knew what the words meant. Courtney Hodge ("Hodge"), a white male, also reported hearing Smith call Berry a "miate" and another Spanish word. Hodge also saw Smith point his finger at Berry.

After interviewing the witnesses and reviewing Smith's personnel file, Trosper and Graham decided to terminate Smith. During the termination meeting, Smith informed Trosper and Graham that he had complaints against Bray and Berry. Smith complained that Bray had called him "Elton John" on February 16, 2001.[6] Smith also stated that he was upset with Berry

---

[6] According to Smith, the name "Elton John" has homosexual connotations. Smith admits that he had more seniority than Bray, and that Bray had no supervisory power over him.

3

because he called him "Wachinka Totonka."[7] Based on these complaints, Trosper and Graham wrote-up Berry on March 2, 2001, counseling him about the use of nicknames and swear words in the workplace. They also issued a write-up to Bray regarding the use of derogatory names and horseplay in the workplace. Encinias also received a write-up for his role in the incident.

On March 22, 2001, Smith filed a EEOC Charge against Honeywell. Smith marked the "race box" and alleged that he did not do anything that the accuser (Berry) who is a black male did not do himself and no action was taken against him." Smith filed a second EEOC Charge on July 16, 2001, alleging race, age and sex discrimination. He based his sex claim on the allegation that Bray called him "Elton John." He based the age claim on the fact that neither Berry or Bray, who are younger, were terminated for their participation.

On July 31, 2001, Smith filed a civil action against defendant Honeywell. Smith brought race discrimination claims pursuant to Title VII for disparate treatment and wrongful termination. He brought race discrimination claims under 42 U.S.C. § 1981 for disparate treatment and wrongful termination. Smith also brought a claim for age discrimination pursuant to the Age Discrimination in Employment Act ("ADEA"). Furthermore, he filed claims for retaliatory discharge under Title VII, 42 U.S.C. § 1981, and the ADEA. Honeywell's moves for summary judgment on all claims raised by Smith.

## ARGUMENTS

Honeywell argues that Smith's race claims regarding his discipline and termination are due to be dismissed. It claims that Smith has not presented any direct evidence of race

---

[7] Smith stated in his deposition that he was not offended by Berry's use of this name on the morning of February 16, 2001. (Smith Depo. at 240). After Berry registered his complaint against Smith, Smith decided to file a complaint against Berry for the use of this Indian name. *Id.* at 240-41.

discrimination. Consequently, it notes that Smith must rely on circumstantial evidence to prove his race claims under Title VII and 42 U.S.C. § 1981. Honeywell contends that Smith's race claims must fail because Smith cannot dispute that he knowingly used a racial slur against a black co-worker in violation of Honeywell's policies. Furthermore, it claims that the claims must fail because Smith cannot dispute Honeywell's legitimate, nondiscriminatory reasons for termination of his employment. Relying on *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) (en banc), Honeywell states that where the employer provides "clear and reasonably specific" reasons for its actions, the employer is entitled to summary judgment unless the plaintiff can prove the stated reasons are a pretext for discrimination. In support of its contention that it fired Smith for legitimate, nondiscriminatory reasons, Honeywell asserts that it considers racial slurs to be one of the most serious violations that can occur in the workplace, it investigated the allegations, and the investigation produced statements from three white co-workers of Smith who verified Berry's allegations of racial harassment.

Additionally, Honeywell contends that Smith cannot prove that its decision was based on his race. Quoting *Hitchens v. County of Montgomery*, 2002 U.S.Dist. LEXIS 2803 (E.D. Pa. Feb. 20, 2002), Honeywell notes that in a race discrimination case "the plaintiff must present substantial evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon . . . race." To demonstrate that Smith was not treated differently for his racial slur, Honeywell asserts that it terminated Johnny Henderson, a white male, seven months prior to Smith's termination, for using the acronym "DAN", which stood for "dumb ass nigger."[8] Honeywell claims that Smith cannot compare himself to Berry, Bray or

---

[8] Honeywell also points out that Smith even attended a counseling session after Henderson was terminated wherein Honeywell management reemphasized Honeywell's policy towards this type of behavior. This comparison

5

Encinias. It claims the Indian name Berry used, "Wachinka Totonka", is not a racial slur. Additionally, it contends that the name Bray called Smith, "Elton John", is a play on words involving Smith's name.[9] Finally, Honeywell states that the Eleventh Circuit recognizes that an employer can make decisions with regard to discipline or termination as long as those decisions are not based on protected categories: "[An] employer may . . . [make an employment decisions] for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (1984).

Turning to Smith's age discrimination claims, Honeywell states that Smith has presented no direct evidence of age discrimination. It asserts that Smith referred to himself as "old man" and asked others to call him the same. Furthermore, it notes that Smith has not identified any member of management and/or a decisionmaker who called him an "old man." It concludes by stating that "stray remarks" made by co-workers do no constitute direct evidence of discrimination. *See Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987).

Since Smith cannot present any evidence of direct discrimination, Honeywell contends, he must rely on the circumstantial model for the allocation of burdens of proof, persuasion and production defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). According to Honeywell, Smith must show that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was qualified for his job; and (4) he was treated differently than employees outside the protected class who were similarly situated. *Id.* at 802. Honeywell

---

to another white employee is questionable.

   [9] Honeywell notes that all three employees received documented verbal counseling for their involvement.

argues that Smith cannot present evidence satisfying the fourth prong of this test. It states that Smith was fired for his knowing violation of its Code of Conduct and Workplace Harassment Policy. It claims that an inference cannot be reached that Smith was terminated because of his age simply because Berry and Bray were younger. According to Honeywell, Berry and Bray are not true comparators because they did not engage in racial slurs.

Finally, Honeywell argues that Smith's retaliation claims must fail for the same legitimate, nondiscriminatory reasons which rebut Smith's claims of discrimination. It claims that it has not violated the "participation" and "opposition" clauses of Title VII and the ADEA.[10] To support this argument, Honeywell notes that Smith decided to complain about Berry and Bray's name-calling only after he was called into a meeting regarding Berry's complaints against him. Furthermore, it states that Smith did not report complaints to HR nor did he attempt to report the matter via the 1-800 ACCESS line. It concludes by asserting that Berry and Bray's misconduct do not protect Smith from his own actions.

In response, Smith claims that Berry and Bray also violated terms of the employee

---

[10] The "opposition" and "participation" clauses in Title VII read as follows:

> [It] shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). The ADEA's retaliation clause reads:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or litigation under this chapter.

29 U.S.C. § 623(d).

7

handbook but were not terminated. Specifically, Smith notes that the employee handbook states:

> The Company prohibits all forms of harassment of employees by fellow employees, employees of outside contractors or visitors. This includes any demeaning, insulting, embarrassing or intimidating behavior directed at any employee because of his or her gender, race, ethnicity, sexual orientation, physical or mental disability, age, pregnancy, religion, veteran status, national origin or any other legally protected status.

Additionally, Smith points out that the employee handbook prohibits hostile physical confrontations:

> The Company prohibits employees from engaging in any hostile physical contact, intimidation, threats of such actions or violence, or any other actions that may be considered threatening or hostile in nature while on Company premises, at a Company-sponsored function, while representing Honeywell or acting on its behalf.

According to Smith, it is undisputed that Berry called him a Spanish name that carried racial overtones. He also notes that Bray called him a name that carried homosexual overtones. Furthermore, he states that Berry violated Honeywell's policy against hostile physical confrontations. He claims that Berry cursed him and threatened him after he found out what "Miati" meant in Spanish.

Smith also argues that Honeywell's reasons for termination are pretext. He claims that Trosper and Graham were aware that Berry knew the meaning of the words when Berry and Smith used them. Smith contends that Berry wanted to use the words to be called "Black Foot" and thought the use of these words was a laughing matter. Additionally, he notes that Berry and Bray attended the same counseling session that he attended after a co-worker was fired for using a racial slur. Furthermore, he notes that Honeywell considered his conduct a clear violation of its policy against the use of racial slurs. However, he points out that Honeywell's rules and policies against harassment prohibit race, age and sexual orientation harassment. Thus, he

8

claims that other employees should of been terminated for their use of terms such as "Wachinka Totonka", "Elton John", and "old man."

In reply, Honeywell states that Smith's claim that he called Berry "Miati *F*oto" instead of "Miati *P*uto" is to no avail. According to Honeywell, the fact that Smith used the term "Miati," Spanish for "nigger," is sufficient basis for Smith's termination. Furthermore, it claims that Smith has not presented any evidence of pretext regarding his claims of reverse race and age discrimination and retaliation.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed during the pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Id.* The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial. *Id.* at 324. "When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987).

## CONCLUSIONS OF THE COURT

Unfortunately, sophomoric workplace conduct substantially instigated by the plaintiff resulted in his termination. Notwithstanding the harshness of the discipline, there is absolutely no evidence which creates a reasonable inference that the termination was based upon plaintiff's sex, age or race or that it was in retaliation for any protected activity. The alleged conduct of others was not similar to that of the plaintiff; certainly not "nearly identical." The discharge came as the result of a "zero tolerance" policy which had been applied after an earlier incident which was followed by further counseling to all. While the action may be harsh, there is no reasonable inference that the reason given is pretextual. Even if the defendant used poor judgment or made a mistake, that is not tantamount to an unlawful act. The defendant's motion will be granted.

This 5th day of July 2002.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**